|  |  |
|---|---|
| SIARHEI FILAZAPOVICH et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> DEPARTMENT OF STATE et al., ) <br> ) <br> Defendants. ) | Case No. 21-cv-00943 (APM) |
| BRANDON KIN SHAUN GOH et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> U.S. DEPARTMENT OF STATE et al., ) <br> ) <br> Defendants. ) | Case No. 21-cv-00999 (APM) |
| MAXWELL GOODLUCK et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> JOSEPH R. BIDEN, JR. et al., ) <br> ) <br> Defendants. ) | Case No. 21-cv-01530 (APM) |
| JANAN VARGHESE JACOB et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> JOSEPH R. BIDEN, JR. et al., ) <br> ) <br> Defendants. ) | Case No. 21-cv-01874 (APM) |

| | |
|---|---|
| **HABIB KASSAIAN et al.,**  Plaintiffs,  v.  **JOSEPH R. BIDEN, JR. et al.,**  Defendants. | Case No. 21-cv-02033 (APM) |
| **ABROR DJURAEV,**  Plaintiff,  v.  **JOSEPH R. BIDEN et al.,**  Defendants. | Case No. 21-cv-02071 (APM) |
| **SALAM S. NORI KAMOONA et al.,**  Plaintiffs,  v.  **JOSEPH R. BIDEN, JR. et al.,**  Defendants. | Case No. 21-cv-02228 (APM) |

**MEMORANDUM OPINION AND ORDER**

In its Memorandum Opinion and Order issued on September 9, 2021, the court ordered "Defendants to expeditiously process and adjudicate diversity visas prior to September 30, 2021," and withheld decision on whether to reserve diversity visas and how many to reserve until "closer to the end of the 2021 fiscal year." *Filazapovich v. Dep't of State*, No. 21-cv-943 (APM), 2021

WL 4127726, at *26 (D.D.C. Sept. 9, 2021). The 2021 Fiscal Year expires today, and, having received additional submissions and updated data from the parties, the court is now prepared to resolve the issue of whether it should reserve visas and, if so, how many visas it should reserve.

## I.

Defendants, for their part, maintain that the court should not—and indeed, cannot—reserve any visas to be issued after the end of the 2021 Fiscal Year. They raise the same objections to the court's reservation of visas that they raised in *Gomez v. Trump*, 490 F. Supp. 3d 276 (D.D.C. 2020). *See* Defs.' Submission Regarding Visa Reservations, *Goodluck v. Biden*, No. 21-cv-1530, ECF No. 60 [hereinafter Defs.' Br.], at 3–4. Specifically, they argue that reserving diversity visas would contravene "clear statutory language limiting Plaintiffs' eligibility [to] the end of the fiscal year" and suggest the court is "reading too broadly the D.C. Circuit['s] opinion in *Almaqrami v. Pompeo*, [933 F.3d 774 (D.C. Cir. 2019)]." *Id.* at 3. At bottom, they argue that, despite this court's conclusion that they have violated the law, there is no remedy for those harmed by their actions. As this court explained in *Gomez*, however, the most on-point authority from the D.C. Circuit strongly suggests otherwise. In *Almaqrami*, the D.C. Circuit stated that when "the court grants *some* relief—but not the visa—before October 1[,] . . . after the selection FY has ended, the court might lawfully take steps to compel the government to process the plaintiff's application and issue her a diversity visa anyway." 933 F.3d at 780. To be sure, *Almaqrami* arose in a different posture than this case, as Defendants argue. *Id.* at 779 (noting the Circuit was reviewing dismissal of the case on mootness grounds). But the court finds *Almaqrami*'s reasoning regarding the court's equitable authority compelling and applicable in the present circumstances. Accordingly, "because the fiscal year has not yet passed, the court plainly has the equitable authority and discretion to order Defendants to reserve visas." *Gomez*, 490 F. Supp. 3d at 286.

## II.

Defendants next advance a brand-new argument that they did not raise in their briefing on the summary judgment motions in *Goh* or the preliminary injunction motions in *Filazapovich* and *Goodluck*. They argue that "*each and every*" Plaintiff must demonstrate that they have standing to be entitled to relief. Defs.' Br. at 4–5. Not only is Defendants' argument procedurally improper, it is simply incorrect. "'[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case.'" *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) (quoting *Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993)); *see also Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[B]ecause the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement . . . we . . . limit our discussion [of standing] to [named plaintiff] FAIR.").

Defendants cite two cases that they argue stand for the proposition that every Plaintiff must demonstrate that they have standing. Neither case is applicable to a case such as this one, where Plaintiffs' claims are brought pursuant to the APA and the court is not ordering individualized relief. First, Defendants cling to the Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Defs.' Br. at 4. *TransUnion*, however, was a case about damages, and it merely held that, even in a class action, "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion*, 141 S. Ct. at 2208 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) (opining, again in a case about damages, that "Tyson's insistence on a lump-sum jury award cannot overcome the limitations placed on the federal courts by" Article III)). In fact, the *TransUnion* Court drew a distinction between the standing inquiry for injunctive relief and that for damages.

3

In rejecting the plaintiffs' argument that they could rely on an increased risk of future harm to support their claim for damages, the Court noted that "a person exposed to a risk of future harm may pursue forward-looking, *injunctive relief* to prevent the harm from occurring." *Id*. at 2210 (emphasis added). But, it concluded, "a plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages." *Id.* That is because the damages inquiry at issue in cases like *TransUnion* is critically different from the issue presented here, where the State Department and not the court will ultimately determine who is entitled to a diversity visa. A plaintiff seeking to prove damages must "establish the amount of compensable" harm that accrued to them as an "individual plaintiff," and thus it is axiomatic that the plaintiff must demonstrate compensable individual harm to recoup damages. *Tyson Foods*, 577 U.S. at 463 (Roberts, C.J., concurring). There is no such concern here where the court is simply awarding equitable relief to provide Plaintiffs *collectively* a fair opportunity to apply for a diversity visa that they otherwise have been denied due to the State Department's unlawful actions. *TransUnion* thus did not overturn decades of Supreme Court precedent that only one plaintiff must have standing to obtain injunctive relief against a generally applicable policy. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 189 (1973) (concluding "we need not pass upon the status of these additional appellants in this suit, for the issues are sufficiently and adequately presented by Doe and the physician-appellants, and nothing is gained or lost by the presence or absence of the" additional plaintiffs).

Second, Defendants rely on *M.M.V. v. Garland*, a case challenging the validity of the so-called "Transit Rule," which required "aliens seeking to enter the United States at the southern border" to "appl[y] for asylum in a country through which they traveled while en route" before seeking asylum in the United States. 1 F.4th 1100, 1105 (D.C. Cir. 2021). There, the court

4

declined to apply "the rule that if many plaintiffs seek the same relief and at least one of them has Article III standing, the court need not determine whether others also do." *Id.* at 1110. That rule, the court explained, "does not apply if each plaintiff seeks 'additional' individualized relief." *Id.* (quoting *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017)). The plaintiffs in *M.M.V.* sought additional individualized relief because they requested "an order enjoining the government from removing any one plaintiff without providing that plaintiff with further individualized adjudicatory process." *Id.*

Defendants have made no attempt to explain how the relief that Plaintiffs in this matter seek—reservation of visas—is "individualized," and, indeed, it is not. On that score, it is important to consider what the court's reservation of visas will—and will *not*—accomplish. The court's order will reserve a number of visas for the State Department to continue processing after the Fiscal Year. The order will *not* single out any Plaintiff and order the State Department to issue that Plaintiff a visa. All Plaintiffs wishing to receive a visa still will need to complete a satisfactory application and be documentarily qualified, and the Department still will need to independently review and adjudicate that application, which includes the requisite interview and medical showings. The court's order merely extends the time in which the Department will do so.

This generalized relief is consistent with the kind of relief that is routinely awarded in APA cases. APA challenges to the facial validity of a rule or policy do not generate individualized relief. Rather, where an APA challenge succeeds against a rule or policy "of broad applicability[,] . . . the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting)). In such a circumstance, "a single plaintiff, so long as he is injured by the rule, may

5

obtain 'programmatic' relief that affects the rights of parties not before the court." *Id.* (quoting *Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting)). Here, the court is awarding programmatic relief to parties before the court by requiring the State Department to preserve visas for later processing, and as such, only one Plaintiff must demonstrate standing for the court to award relief.

## III.

### A.

With those preliminaries resolved, the court must determine whether it is appropriate to order Defendants to reserve diversity visas for processing after the end of the 2021 Fiscal Year. It is. Additional relief is necessary to "meet the exigencies of the . . . case," *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, at 115 (3d ed. 2013)), and to adequately "address each element contributing to the violation," *Hutto v. Finney*, 437 U.S. 678, 687 (1978).

As of September 26, 2021, Defendants have issued a total of only 15,001 diversity visas of the 54,750 diversity visas allocated for the fiscal year, or approximately 27% of the diversity visas that Congress made available for Fiscal Year 2021.[1] *See* Defs.' Status Report, *Goodluck*, No. 21-cv-1530, ECF No. 61 [hereinafter Defs.' Status Report], Ex. B, Decl. of Brenda L. Grewe, ECF No. 61-2 [hereinafter Grewe Decl.], ¶ 2.[2] In contrast, as the court observed in *Gomez*, "between 1998 and 2016, the State Department issued an average of 47,404 diversity visas per year, or between 86% and 95% of the total annual diversity visas allotted by Congress." *Gomez*, 490

---

[1] While the State Department continued to process visas between September 27 and September 30, it was unable to provide updated visa issuance numbers for those dates due to data processing and information security requirements. *See* Grewe Decl. ¶ 3. The September 26 number is therefore the most up-to-date number available to the court, and the court here is engaging in equity, not scientific precision, so the number 15,001 will do. Additionally, where the court's math results in percentages or ratios that are not whole numbers, the court has consistently rounded to the hundredths place.
[2] *See also* U.S. Dep't of State, Bureau of Consular Affs., Visa Bulletin for September 2020 (Aug. 10, 2020), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2020/visa-bulletin-for-september-2020.html [hereinafter Sept. 2020 Visa Bulletin] (noting the DV-2021 limit was "approximately 54,750").

F. Supp. 3d at 287.  Suffice it to say that, notwithstanding the court's order of preliminary relief, Defendants will come nowhere close to the statutory cap for Fiscal Year 2021, let alone the historical average of diversity visas actually issued.

The court (once again) appreciates the efforts of State Department officials and employees who have processed diversity visas to comply with the court's injunction, but those efforts "do not obviate the need for additional relief." *Id.*  Unless additional relief is granted, the shortfall of visas issued for Fiscal Year 2021 from the historic average will be dramatic.  Some of that shortfall is no doubt due to the difficulties caused by the COVID-19 pandemic, but the pandemic is not the primary culprit.  That would be the State Department's complete cessation of adjudicating diversity visa applications for five months and its unlawful deprioritizing of those applications when adjudications resumed.  *See Filazapovich*, 2021 WL 4127726, at *26.

Reserving additional visas past the close of the fiscal year also comports with the additional requirements of injunctive relief.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Failure to issue such relief will result in irreparable harm to Plaintiffs, who will otherwise lose their opportunity to have their applications adjudicated and possibly receive a visa.  Such relief is also in the public interest because "there is a substantial public interest in having governmental agencies abide by the federal laws," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up), and an order reserving additional visas is necessary to remedy Defendants' violations of law.

**B.**

The question now is how many visas to order reserved.  Despite repeated entreaties to offer a proposal for reserving visas, Defendants have declined to take a position other than "0."  The court therefore focuses on Plaintiffs' proposals.  Plaintiffs in the *Goodluck*-related cases request

7

that the court "preserve a visa for every single plaintiff." Hr'g Tr. (draft), Sept. 27, 2021 [hereinafter Hr'g Tr.], at 26. The *Goh* Plaintiffs' primary position is that the court should "reserve *all* unused visa numbers for fiscal year 2021" and that, whatever the court does, it "should set aside 2,250 visas for named *Goh* plaintiffs." Joint Status Report, *Goh v. U.S. Dep't of State*, No. 21-cv-999, ECF No. 40 [hereinafter *Goh* JSR], at 6, 8 (footnote omitted). Alternatively, the *Goh* Plaintiffs propose that the court follow the model it adopted in *Gomez*. *Id.* at 7–8. Under that method, the court would first estimate the impact of COVID-19 on the State Department's overall processing of visas by comparing the number of immediate relative visas that the State Department issued in Fiscal Year 2021 to the number of immediate relative visas that the State Department issued in Fiscal Year 2019 (the last Fiscal Year that was unaffected by the pandemic). *Id.* The ratio of immediate relative visas issued in Fiscal Year 2021 to the number of immediate relative visas issued in Fiscal Year 2019 would yield a percentage that approximates the State Department's decreased capacity to issue visas due to the pandemic. The *Goh* Plaintiffs then suggest that the court take the "eighteen-year pre-pandemic average of 47,404 diversity visas issued per year" and multiply it by the percentage derived from the rate of immediate relative visa issuance. *Id.* at 8 (citing *Gomez*, 490 F. Supp. 3d at 290). That is, they suggest that the court take the expected number of diversity visas in a given year and discount that expected number by the State Department's reduced capacity during the pandemic. Finally, they propose that the court subtract the number of diversity visas the State Department has already issued for Fiscal Year 2021 from that total. *See id.* (requesting the court reserve "36,027 minus the total number of DV-2021 visas already issued"). By this approach, the number of reserved visas would be approximately 21,000.

None of Plaintiffs' proposals are ultimately equitable for two reasons. First, reserving a visa for every Plaintiff or reserving all unused visa numbers would put Plaintiffs in a better position than if Defendants had not acted unlawfully. *Gomez*, 490 F. Supp. 3d at 289 ("As a court of equity, the court cannot place Plaintiffs in a *better* position than they would have been in but for the State Department's legal mistakes."). Reserving a visa number for every Plaintiff would not account for the dramatic effect the COVID-19 pandemic has had on the State Department's ability to process visas worldwide or for the fact that, even in a normal year, a diversity visa selectee is not guaranteed a diversity visa. The court cannot fashion a remedy that effectively secures a diversity visa for nearly every Plaintiff. That result would be wholly at odds with how Congress contemplated the system would operate. *See* 8 U.S.C § 1153(e)(2) (providing that diversity visas "shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State for the fiscal year involved"). Accordingly, the court cannot reserve all unused diversity visa numbers or reserve diversity visa numbers for each Plaintiff.

Second, the court cannot simply follow the same framework it used in *Gomez* because *Gomez* was a class action, *see* 490 F. Supp. 3d at 291–94, and Plaintiffs before the court in these matters, though numerous, do not represent a certified class. Because there is no class, only Plaintiffs are eligible for the visa numbers that the court orders reserved. *See id.* at 291 (noting class certification was necessary to preserve the "eligibility" of non-named plaintiffs "for the visa numbers that the court has ordered the State Department to reserve after September 30"). There are fewer Plaintiffs before the court now than there were in *Gomez*, and the court must account for the fact that the reserved visa numbers will be distributed amongst a smaller population. Without such an accounting, the court would put Plaintiffs in a better position than they would have been

9

absent Defendants' unlawful conduct because it would artificially increase Plaintiffs' odds of obtaining a diversity visa.

The court's model therefore must account for both the pandemic's impact on the State Department's capacity to issue visas and the fact that there are fewer Plaintiffs before the court than applicants for diversity visas. This model will, of course, only estimate the appropriate number of visas, but the court has endeavored to build in each of the factors that Plaintiffs have identified to provide as robust a model as possible. The court starts from the premise that, as it noted in *Gomez*, the State Department has issued an average of 47,404 diversity visas over the last eighteen years. *Id.* at 290. That number, however, must be adjusted to account for the reduced impact on the number of diversity visas available of the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. Law 105-100, 111 Stat. 2160, § 201 (1997). Since Fiscal Year 1999, "up to 5,000 of the 55,000 annually-allocated diversity visas [were] made available for use under the NACARA program." 9 FAM 502.6-2(c). Historically, it appears that 5,000 visas, the maximum available, were reserved for the NACARA program each year, reducing the available diversity visas to 50,000.[3] In 2021, however, only 250 diversity visas were reserved for the NACARA program, resulting in 54,750 diversity visas being available.[4] Assuming that the State Department issues the additional 4,750 diversity visas at the same clip at which it issued 50,000 diversity visas in the past eighteen years (that is, fulfilling 47,404 of 50,000 visas or 95% of available visas), one would expect the State Department to issue an additional 4,513 diversity

---

[3] *See, e.g.*, U.S. Dep't of State, Bureau of Consular Affs., Visa Bulletin for August 2019 (July 5, 2019), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2019/visa-bulletin-for-august-2019.html (noting the NACARA program "resulted in reduction of the DV-2019 annual limit to 50,000"); U.S. Dep't of State, Bureau of Consular Affs., Visa Bulletin for August 2018 (July 10, 2018), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2018/visa-bulletin-for-august-2018.html (noting the NACARA program "resulted in reduction of the DV-2018 annual limit to 50,000").
[4] *See* Sept. 2020 Visa Bulletin (noting the NACARA program "result[ed] in reduction of the DV-2021 annual limit to approximately 54,750").

visas (95% of 4,750) in Fiscal Year 2021 above the eighteen-year average. Thus, the court starts with 51,917 visas as the expected number of diversity visas issued in a non-pandemic year (47,404+4,513).

The court must next account for the pandemic's impact on the State Department's visa processing capacity. To do that, it will again consider the Department's processing of immediate relative visas in Fiscal Year 2021 compared to the Department's processing of immediate relative visas in Fiscal Year 2019, the last fiscal year before the pandemic. *See Gomez*, 490 F. Supp. 3d at 289. In Fiscal Year 2019, the State Department issued 186,584 immediate relative visas. *Goh* JSR at 7. Through July 2021, the State Department had issued 118,538 immediate relative visas, and it had issued 11,854 such visas a month, on average. *Id.* If the State Department maintained its average monthly totals for August and September of 2021, it would issue 142,246 immediate relative visas in Fiscal Year 2021 (118,538+11,854+11,854). *See id.* That means that, in Fiscal Year 2021, the State Department issued immediate relative visas at approximately 76% its Fiscal Year 2019 rate (142,246/186,584). If the State Department had approached diversity visa issuance with the same vigor in Fiscal Year 2021, one would therefore have expected the State Department to have issued 39,457 diversity visas (76% of 51,917).

Next, the court must subtract the number of diversity visas that the State Department actually issued in Fiscal Year 2021 from the number it could have been expected to process. As of September 26, 2021, the State Department had issued 15,001 diversity visas. *See* Grewe Decl. ¶ 2. That means that the State Department issued 24,456 fewer diversity visas than expected (39,457–15,001).

Having determined the pool of diversity visas that are potentially allocable—24,456 diversity visas—the court must now determine how many diversity visas to reserve so that

Plaintiffs in these matters will have approximately the same odds of obtaining a diversity visa as they would have but for Defendants' unlawful conduct. That is, the court must account for the fact that each diversity visa selectee is not guaranteed a diversity visa because more lottery winners and beneficiaries were selected than there are available diversity visas. *See Filazapovich*, 2021 WL 4127726, at *9. For Fiscal Year 2021, 137,969 diversity visa entrants and their beneficiaries were selected. Every year, some portion of those individuals never submit an application for a diversity visa. According to Defendants, 50,756 applicants submitted an application in Fiscal Year 2021. *See* Defs.' Status Report, Ex. A, Decl. of Morgan Miles, ECF No. 61-1 [hereinafter First Miles Decl.], ¶ 2. That number, however, is just the number of primary selectees who submitted an application and does not include derivative beneficiaries' applications, which "KCC is not able to track centrally." *Id.* The court must therefore estimate the combined number of applicants and beneficiaries that have submitted applications for diversity visas. To do so, it will estimate the average number of beneficiaries that each selectee has. Defendants have averred that there were 71,817 diversity visa selectees in Fiscal Year 2021 and 137,969 total applicants. *See* Defs.' Mot. to Dismiss, or, in the Alternative, for Summ. J., *Goh*, No. 21-cv-999, ECF No. 22, Ex. C, Declaration of Morgan Miles, ECF No. 22-4, ¶ 4. That means that there were 66,152 potential beneficiaries in Fiscal Year 2021 (137,969 total applicants–71,817 diversity visa selectees). On average, each selectee therefore has approximately 0.92 beneficiaries (66,152 beneficiaries/71,817 selectees). Accordingly, if 50,756 selectees applied, one would expect those selectees to have 46,696 beneficiaries, making the actual number of individuals seeking a diversity visa 97,452 (50,756+46,696).

Of those 97,452 individuals vying for a diversity visa, 15,001 have already been issued a visa, leaving 82,451 eligible (97,452–15,001). Further, 3,370 applicants have had their

applications denied following an interview. Grewe Decl. ¶ 2. Accordingly, there are 79,081 selectees and beneficiaries who have chosen to pursue a diversity visa but have not yet received an adjudication (82,451–3,370). This is the total population with which Plaintiffs are competing for the limited diversity visas available.[5]

All else being equal—that is, admittedly not taking into consideration the stage of one's application, one's lottery rank, or any of a host of factors that may ultimately affect an applicant's eligibility—the odds of any one of those remaining selectees being selected for a diversity visa is 31% (24,456 visas/79,081 remaining applicants). To determine the number of diversity visas to reserve, the court must multiply this percentage by the number of still-aggrieved Plaintiffs before it. Plaintiffs in the matters related to *Goodluck* represent that 22,303 Plaintiffs (21,484 in *Goodluck*; 681 in *Jacob*; 4 in *Kamoona*; 2 in *Kassaian*; 128 in *Filazapovich*; and 4 in *Djuraev*) have outstanding, not-finally-adjudicated visa applications. Joint Status Report, *Goodluck*, No. 21-cv-1530, ECF No. 54, at 3. The *Goh* Plaintiffs represent that 1,550 Plaintiffs and their derivative beneficiaries have outstanding, not-finally-adjudicated visa applications. *See Goh* JSR at 5. Taking those numbers by the percentage likelihood that Plaintiffs would receive a diversity visa in the first place yields approximately 6,914 diversity visas for the *Goodluck*-related Plaintiffs (31% of 22,303) and 481 diversity visas for the *Goh* Plaintiffs (31% of 1,550).[6]

Accordingly, the court orders the State Department to reserve 6,914 diversity visas for adjudication pending final judgment in the *Goodluck*-related matters and orders the State Department to make 481 diversity visas available for adjudication following the entry of final

---

[5] Admittedly, Plaintiffs are not "competing" with anyone after the close of the fiscal year because non-party selectees and derivative beneficiaries are not eligible for any relief as this case is not a class action. The court is simply trying to determine the odds of these Plaintiffs obtaining a diversity visa, which necessarily requires taking account of the number of non-Plaintiff selectees.

[6] The court estimates these values separately because the *Goodluck*-related matters and the *Goh* matter are in different postures.

judgment in *Goh*. The State Department shall adjudicate the 481 diversity visas reserved for the *Goh* Plaintiffs by the close of Fiscal Year 2022.

Dated: September 30, 2021

                                              Amit P. Mehta
                                              United States District Court Judge